**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LABORANT, LLC,<br>*Plaintiff,*<br>v.<br>THE UNITED STATES,<br>*Defendant.* | Civil Case No.: 24-1432 C<br>Chief Judge Elaine D. Kaplan |

**FIRST AMENDED COMPLAINT**

Plaintiff, Laborant, LLC, doing business as ArcPoint Labs, a Limited Liability Company, registered in the state of Florida ("Laborant"), brings this action for damages against the United States of America. Despite entering into an agreement with Laborant, and inducing and enjoying the benefits of Laborant's performance, the United States has balked on its obligations to pay. The United States agreed to repay Laborant for testing, treating, or vaccinating uninsured individuals. These services were critical in the fight against the 2019 Novel Coronavirus ("COVID-19"). Laborant—induced by the United States' promise to pay for such services—undertook a valiant effort to treat and test tens of thousands of uninsured individuals in south Florida. Moreover, Congress created a statutory scheme which obligated the Government to pay for such services. Congress, for good reason, created such a scheme to respond to the novel Coronavirus pandemic. Such a scheme allowed the Government to incentivize private companies to test, treat, and vaccinate

uninsured individuals. This program also provided a strong incentive to uninsured individuals to seek out testing, treatment, and vaccination without fear of being denied treatment for their inability to pay. Now, the Government seeks to turn a blind eye to its obligations. Instead, the Court should require the Government to make good on its promise and pay Laborant what it is owed.

## INTRODUCTION

**1.** On January 30, 2020, the Center for Disease Control ("CDC") confirmed the first recorded case of a person-to-person spread of COVID-19 in the United States.

**2.** The following day, the Secretary of Health and Human Services ("HHS") declared COVID-19 a public health emergency.

**3.** On February 4, 2020, the Food and Drug Administration approved the emergency use authorization for the CDC-developed COVID-19 diagnostic test kit. On March 13, 2020, the Trump Administration declared a nationwide emergency, and, two days later, States began to implement shutdowns in order to prevent the spread of COVID-19.

**4.** On March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA"), Public Law 116-127, which made emergency supplemental appropriations for the 2020 fiscal year. Within the FFCRA was $1 billion "to pay for the claims of providers for reimbursement . . . for health services consisting of SARS-CoV-2 or COVID-19 related items and services as described in paragraph (1) of section 6001(a) of division F of [the Act]."

**5.** On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Public Law 116-136, which established the Provider Relief Fund ("PRF"). The PRF was established to reimburse, through grants or other mechanisms, eligible health care providers for increased expenses or lost revenue attributable to COVID-19. PRF funds, according to Congress, were grants that do not need to be repaid so long as providers attested to receiving these funds and complied with the applicable terms and conditions.[1]

**6.** HHS tasked the Health Resources and Services Administration ("HRSA") with administering the PRF. HHS used a portion of the PRF "appropriation to ***pay providers*** for treatment[s] provided to uninsured individuals because no other funding was appropriated for this purpose."[2]

**7.** Against this backdrop of a nationwide emergency, limited testing and treatment supplies, and economic uncertainty, private companies stepped up to the plate. In an attempt to curb a rapidly spreading virus, companies, like Laborant, undertook a critical role of testing and treating patients regardless of insurance status.

**8.** Laborant did so predicated upon the offer put forward by the Government. Then-Secretary of HSS Alex Azar informed the public that, "Under the President's direction, we will use a portion of that funding to cover providers' costs of delivering COVID-19 care for

---

[1] Elayne J. Heisler, Cong. Rsch. Serv., R46897, *The Provider Relief Fund: Frequently Asked Questions* (2022). Available at: https://www.congress.gov/crs-product/R46897

[2] *Id.*

the uninsured, sending the money to providers through the same mechanism used for testing. As a condition of receiving funds under this program, **providers will be forbidden from balance billing the uninsured for the cost of their care. Providers will be reimbursed at Medicare rates."**[3] Put simply, if a company elected to participate in the COVID-19 Uninsured Program, it did so by relinquishing its right to receive payment from the uninsured individual. Instead, only the Government could pay for such services.

**9.** Laborant played a crucial role in the Nation's strategy for reducing the spread of COVID-19. It was an approved participant in the program for testing uninsured individuals during the nationwide emergency. Because of the certainty of payment from the Government, Laborant tested individuals without insurance and foreigners present in the United States during the COVID-19 pandemic. In December 2021 and January 2022, Laborant tested up to 1,100 individuals per day. This is consistent with the surge of reported COVID-19 cases during that time period. The Government, however, elected to not uphold its end of the bargain and continues to refuse to pay Laborant what it is entitled.

## JURISDICTION

**10.** This Court has jurisdiction pursuant to the Tucker Act. 28 U.S.C. § 1491(a)(1). Section 1491(a)(1) vests this Court with jurisdiction to "render judgment upon any claim against the United States founded [upon] any Act of Congress or regulation of an executive department [or] upon any express or implied contract with the United States."

---

[3] April 3, 2020 Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Briefing.

**11.** Laborant had an implied-in-fact contract with the United States that was breached by the United States when it failed to pay Laborant as required by the terms and conditions of the HRSA COVID-19 Uninsured Program.

**12.** Additionally, the statutory scheme consisting of the CARES Act, FFCRA, Paycheck Protection Program and Health Care Enhancement Act, the American Rescue Plan Act, the Coronavirus Response and Relief Supplement Appropriations Act, and the regulatory framework created by HHS ("COVID STATUTES"), are money-mandating. This statutory framework evidences both an intent to contract with providers while also creating for Laborant, upon its performance in accordance with those statutes and regulations, a right to payment that was breached by the United States when it failed to pay Laborant as required by such statutes.

**PARTIES**

**13.** Plaintiff Laborant, doing business as ArcPoint Labs of Coral Springs, Florida, is and was at all relevant times a limited liability company, organized and existing under the laws of the state of Florida with its principal place of business in Florida. During the relevant time period of its contract with the United States, Laborant's principal place of business was Coral Springs, Florida but as of January 2024 its principal place of business changed to Tamarac, Florida.

**14.** The United States of America is the Defendant in this action. HHS is a department within the executive branch of the Government that oversees the activities of HRSA. HRSA

is an agency within HHS and HHS charged HRSA with the administration of the COVID-19 Uninsured Program.

## BACKGROUND

**15.** In order to stop the spread of COVID-19, the Government erected a scheme in which it would pay private companies that tested, treated, or vaccinated uninsured individuals for COVID-19. This scheme was critical to ensuring that uninsured individuals were able to receive these services.

**16.** The scheme, called the COVID-19 Uninsured Program, leveraged existing laboratories and testing facilities in the private sector to fulfill this goal.

**17.** HHS charged HRSA with oversight of the COVID-19 Uninsured Program. The purpose of the HRSA COVID-19 Uninsured Program was to provide claims reimbursement to health care providers for COVID-19 testing, treatment, or vaccine administration for uninsured individuals who did not have any health care coverage at the time services were rendered.

**18.** The COVID-19 Uninsured Program contained two components for which it provided reimbursement to providers:

> a. The first component covered reimbursement for COVID-19 testing services. The FFCRA, passed March 18, 2020, provided $1 billion "to pay for the claims of providers for reimbursement . . . for health services consisting of SARS-CoV-2 or COVID-19 related items and services as described in paragraph (1) of section 6001(a) of division F of [the Act.]" Pub. L. 116-127. Division F of FFCRA covers testing products and related services. *Id.* The Paycheck Protection Program and Health Care Enhancement Act provided $1 billion to this program as well. After the exhaustion of these funds, funds from the American Rescue Plan Act were used to pay providers.

> b. The second component covered reimbursement for COVID-19 treatment services and vaccine administration. The CARES Act provided $100 billion in relief funds. The Paycheck Protection Program and Health Care Enhancement Act provided $75 billion, and the Coronavirus Response and Relief Supplement Appropriations Act ("CRRSA") provided an additional $3 billion in relief funds. This brought the total to $178 billion.

**19.** Because HRSA could not manage this program alone, the United States contracted with UnitedHealth Care to manage the COVID-19 Uninsured Program reimbursement process. UnitedHealth Care, thereafter, served as the administrator of the COVID-19 Uninsured Program.

**20.** In order to participate in the program, a company ("the Recipient") needed a unique identifier that enabled entry into the HRSA COVID-19 Uninsured Program Portal. The unique identifier was designated as an Optum ID, which the Recipient needed to register in order to receive payment.

**21.** Once the Recipient had an Optum ID, it needed to validate a Taxpayer Identification Number ("TIN") for the facility in which care was provided.

**22.** Thereafter, the Recipient had to set up Optum Pay Automated Clearing House ("Optum") which required a TIN, business name, provider type, name of administrator(s), contact information, bank name and contact information, financial institution account information, voided check or bank letter, signed and dated W-9. Optum managed provider payments for the program.

**23.** The first date for which the COVID-19 Uninsured Program was able to provide payment for services was February 4, 2020.

**24.** In December 2020, Laborant attested to the term and conditions as required by the Government. Laborant also verified its TIN, submitted a provider roster, and registered with Optum to ensure that it could receive payment for the services that it rendered to uninsured patients.

**25.** The Terms and Conditions stated that "full compliance with all Terms and Conditions is material to the Secretary's decision to disburse funds" to the Recipient. The Terms and Conditions referred to the reimbursement as "payment." The Terms and Conditions clearly stated that "[t]he Secretary will reimburse the Recipient generally at Medicare rates . . . for the COVID-19 Testing and/or Testing-Related Items and Services that Respondent [sic] provided to FFCRA Uninsured Individuals for which the Recipient submits claims to the FFCRA Relief Fund."

**26.** Laborant began providing treatment and testing services to COVID-19 patients in April 2021.

**27.** During the Omicron surge of COVID-19 from late 2021 to early 2022, Laborant tested up to 1,100 individuals per day.

**28.** At the time Laborant provided the services at issue, the COVID-19 Uninsured Program allowed for 365 days for claims to be submitted for reimbursement. The 365 day timeframe is the Medicare standard for submission of claims. A public-facing website (which remained online after the Government purported the change the deadline for submitting claims) advertised that "for the HRSA COVID-19 Uninsured Program, claims

must be submitted within 365 calendar days from date of service or admittance, and are subject to available funding."

**29.** On or about March 15, 2022, the Government purported to change the deadline by when claims must be submitted to just *seven days later* – March 22, 2022 at 11:59 p.m. The Government asserted that this new, accelerated deadline would apply to both tests performed after March 15, 2022 as well as tests performed before the Government purported to change the deadline for submitting claims.[4]

**30.** HRSA's stated rationale for the significant change was that the program's funding had been exhausted. Critically, however, the Government never stated it lacked funds to pay for the services already provided under the COVID-19 Uninsured Program.

**31.** Due to this acceleration of the deadline, Laborant was forced to rapidly submit thousands of separate claims that—under the original terms of the Uninsured Program—Laborant would have had several additional months to submit. Nevertheless, Laborant submitted almost all of its claims on time. Laborant submitted 9,149 individual claims prior to the deadline which totaled approximately $2,384,515.

**32.** The Government's own contractor confirms that Laborant met the Government's accelerated deadline of March 22, 2022. A November 1, 2023 letter "[t]o whom it may concern" from Jameen H. Mathews, DBA, an Optum official, confirms that 9,149 of

[4] Such a potential change is even more unreasonable when viewed through the lens of the Recipient. Now, Recipients had to verify uninsured status, obtain temporary IDs—which could take up to 24 hours to receive—and process the tests all within a truncated window.

Laborant's unpaid invoices "were submitted by ARCPOINT LABS OF CORAL SPRINGS FL to Optum" on March 22, 2022.

**33.** The Government has repeatedly recognized Optum as its agent for administering the COVID-19 Uninsured Program, including in an August 2, 2023 letter to Laborant's counsel from the Department of Health and Human Services Office of the General Counsel, Public Health Division. That letter states that "the Government's role via its contractor, OptumServe Technology Services, Inc., was to process eligible testing and treatment claims submitted to the Electronic Data Interchange by March 22, 2022."

**34.** To date, the Government has not paid Laborant for any of the outstanding claims. Laborant made many attempts to work with HRSA and HHS to resolve this claim without litigation but was rebuffed each time. HHS maintains that Laborant did not timely submit its claims. Exhibit 1, however, makes clear that Laborant submitted its claims timely.

## LEGAL ALLEGATIONS

### COUNT I: The United States Breached Its Implied-in-Fact Contract with Laborant When It Failed to Pay for the Tests that Laborant Provided to Uninsured Patients.

**35.** Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

**36.** Laborant and the United States entered into an implied-in-fact contract wherein Laborant would provide critical testing and treatment for COVID-19 and the Government would pay, at the relevant rates, for the services that Laborant provided to uninsured individuals.

**37.** The United States, in desperate need of health care providers, created a system for the testing, vaccination, and treatment of the uninsured population. The system was simple: If companies treated and tested individuals without insurance, then the United States would reimburse them for treatments and testing at the Medicare rates. Moreover, HRSA and HHS told companies to rest assured that they would be paid. Reading all of these actions together, the passage of the COVID funding statutes, the creation of the PRF, entering into a contract with UnitedHealth to serve as the Administration of the program, clearly provide evidence of the intent of the United States to enter into a contract with providers wherein it would pay for the services rendered.

**38.** Put simply, the United States offered, and Laborant accepted.

**39.** In order to accept the offer, companies had to attest to the Terms and Conditions, which bound the Recipient to a set of conditions and obligations that must be met in order to be eligible for repayment. HRSA also required companies to submit a TIN, set up Optum Pay ACH, and add a Provider Roster.

**40.** Therefore, the Terms and Conditions form the basis of the contract because they lay out the obligations of both parties, i.e., the Recipient must proceed in a certain manner and, if it does so, then the United States must pay for the services.

**41.** Laborant abided by the Terms and Conditions of the COVID-19 Uninsured Program at all relevant times.

**42.** Critically, Laborant never billed an uninsured patient for its services as it was relying on being paid by the Government under the contract. If Laborant had ever attempted to

recover payment from the uninsured patient, it would have violated the Terms and Conditions of the program, i.e., the contract, and it would have been ineligible to receive repayment, or if it had been paid it would have needed to remit that payment back to the Government.

**43.** Put another way, Laborant gave something up in exchange for this bargain. Laborant turned down its ability to collect from its patients in exchange for the ability to contract with the Government.

**44.** In passing the FFCRA, CARES Act, and other relevant Acts, Congress apportioned money to HHS and directed the Agency to fund the COVID-19 Uninsured Program. This gave HHS the authority to enter into contracts with companies, like Laborant, on behalf of the United States to reimburse those companies for the services they provided to uninsured individuals.

**45.** The Government and Laborant entered into a bargained for quid-pro-quo agreement. The Government will pay so long as Laborant fulfills the Terms and Conditions which required Laborant to forego its ability to bill its uninsured patients. The Government knew of, authorized, funded, and ratified this agreement.

**46.** The existence of such an agreement between the United States and Laborant was confirmed by the United States when it paid Laborant approximately $ 600,000.00 for the services that it submitted to the COVID-19 Uninsured Program.

**47.** On March 22, 2022, Laborant submitted 9,149 separate claims seeking approximately $2,384,515 to the Government's chosen contractor with authority to administer the Uninsured Program.

**48.** The Government incorrectly claimed that the claims were not submitted by the Government's accelerated deadline, persisting in this position even after the Government's own contractor confirmed that the claims were, in fact, received on March 22, 2022.

**49.** As a direct result of the material breach by the United States, Laborant sustained damages from the unjustified denial of approximately $2,384,515 in claims.

**Count II – The United States Breached the Implied Covenant of Good Faith and Fair Dealing in Denying Payment to Laborant And In Purporting to Accelerate the Submission Deadline.**

**50.** Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

**51.** Implicit in every contract is the covenant of good faith and fair dealing. Contracts with the United States are no exception. This covenant imposes a mutual obligation on both parties to not impede the contractual performance of the other party and to not destroy the reasonable expectations of the other party to receive the benefits of the contract.

**52.** The United States, recognizing the dire need for COVID-19 testing and treatment, induced Laborant to test uninsured patients by promising to pay for those services and preventing Laborant from billing the uninsured patients. This contractual agreement required that Laborant test and treat uninsured patients. So long as Laborant submitted the claims on

time and abided by the Terms and Conditions of the COVID-19 Uninsured Program, then the Government would pay those claims.

**53.** Laborant submitted the claims on time and abided by the Terms and Conditions of the COVID-19 Uninsured Program.

**54.** The Government refused, and continues to refuse, to honor its side of the agreement. Instead, the Government has rebuffed all attempts by Laborant to recover. The Government created a set of Terms and Conditions that prevented Laborant from collecting from uninsured patients and then refused to pay Laborant for its services even though Laborant upheld its end of the bargain. These actions by the Government have completely destroyed the reasonable expectations of Laborant, mainly, that it would receive payment for the services it provided from the Government.

**55.** Moreover, the Government also breached the covenant of good faith and fair dealing by purporting to change the deadline to submit claims from 365 days from the date of service to 7 days after the change was made. The covenant of good faith and fair dealing imposes on each party an obligation to not interfere with the other party's performance of the contract and to not destroy the reasonable expectations of the party regarding the fruits of the contract.[5]

**56.** An important part of the consideration of the contract was that, consistent with most insurance standards—including Medicare, the provider would have 365 days to submit

---

[5] *See* Restatement (Second) of Contracts, § 205 (1981).

claims for reimbursement. The Government conformed to this general norm when it enacted the program.

**57.** Abruptly, however, on or about March 15, 2022, the Government purported to change the submission deadline to March 22, 2022. The purported acceleration in the submission deadline was meant to apply not just to tests that *would* be given that week, but also to tests that already *had* been given months earlier. When those services had been performed, providers did so in the expectation that there would be a 365-day reimbursement window. This purported acceleration of the deadline was such a sudden change to the terms of the Government's implied-in-fact contract as to violate the Government's covenant of good faith and fair dealing. Therefore, even if the any of the 9,149 claims could somehow be shown not to have been submitted by the accelerated March 22, 2022 deadline (but still within the 365-day window in place when the services were performed), Laborant would still be entitled to recover the full amount, because the Government's purported acceleration of the deadline breached the implied covenant of good faith and fair dealing.

**58.** The Government caused Laborant damages by breaching the implied covenant of good faith and fair dealing and unjustifiably denying $2,384,515 in claims..

**Count III – The United States Violated the COVID STATUTES by Failing to Pay Laborant.**

**59.** Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

**60.** The funding scheme created by the COVID STATUTES obligated the Government to pay for validly submitted claims for services rendered to uninsured patients.

**61.** HHS was therefore required to pay for these services if Laborant submitted its claims and attested to the Terms and Conditions. Laborant did so and is owed compensation for the services it provided.

**62.** As a direct result of HHS's violation of the COVID STATUTES mandating payment for services, Laborant has a right to recover damages incurred by it in its performance of the requirements.

**63.** Alternatively, the regulatory scheme created by HRSA and HHS under the COVID STATUTES, including the Terms and Conditions, the COVID-19 Uninsured Program FAQs, COVID-19 Uninsured Program Guidelines, and the COVID-19 Uninsured Program Website, all created a vested right of payment for Laborant. When the Government refused to pay, it violated this regulatory framework and Laborant's vested right of payment.

**64.** Laborant, therefore, has a right to recover its damages incurred in reliance on the promises made by the Government that it would be paid if it abided by the Terms and Conditions, which Laborant did.

**65.** The Government caused Laborant damages by failing to abide by its legal obligations and unjustifiably denying approximately $2,384,515 in claims.

## PRAYER FOR RELIEF

Wherefore, Laborant respectfully requests this Court to enter judgment it its favor and against the Defendant and:

**1.** Award damages sustained by Laborant in an amount to be proven at trial;

**2.** Award Laborant such additional damages and other monetary relief, including, but not limited to, interest on Laborant's damages; and

**3.** Grant Laborant any other relief as the Court deems just and proper.

Dated: March 28, 2025

Respectfully submitted,

ROGERS JOSEPH O'DONNELL

By: *_/s/ Aaron P. Silberman_*
Aaron P. Silberman
Timothy A. Wieroniey
311 California Street, 10th Floor
San Francisco, CA 94104
Tel: 415-956-2828; Fax: 415-956-6457
Emails: asilblerman@rjo.com; twieroniey@rjo.com

*Attorneys for Plaintiff LABORANT, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Federal Claims by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Aaron P. Silberman*