IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LABORANT, LLC,

                    Plaintiff,

          v.                                    No. 24-1432
                                        (Judge Elaine D. Kaplan)
THE UNITED STATES,

                    Defendant.

DECLARATION OF ALEXANDRA HUTTINGER IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

I, Alexandra Huttinger, hereby declare that my testimony below is true and correct to the

best of my knowledge and belief and is given under penalty of perjury, pursuant to 28 U.S.C.

§ 1746:

I.    Background

1.    I am the Deputy Associate Administrator for the Provider Relief Bureau ("PRB"),

a Bureau within the Health Resources and Services Administration ("HRSA"), United States

Department of Health and Human Services ("HHS" or "the Department"). I have been in this

position, either as Acting Deputy Associate Administrator or permanently, since March 7, 2022.

2.    I have worked with the Provider Relief Bureau since April 2, 2020, and have

worked continuously with the Provider Relief Bureau with the exception of seven weeks in 2021

(from March 1, 2021, to April 23, 2021).

3.    HRSA's PRB administered the COVID-19 Claims Reimbursement to Health Care

Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured

Program ("Uninsured Program" or "UIP") on behalf of HHS.

4.    As Deputy Associate Administrator, I oversaw all aspects of PRB's direct

provider support and claims reimbursement programs.

5.    In carrying out these responsibilities, I was involved in all major activities and decision-making implicating the various programs and funding streams administered by the PRB, such as overseeing programmatic and policy decisions, budget formulation, and day-to-day programmatic operations.

6.    While I was not personally involved in all communications and decision-making for the PRB, as Deputy Associate Administrator, one of my core functions was to oversee operations by monitoring and liaising with the various staff members who were responsible for the day-to-day management of the various programs under PRB's purview, including the Uninsured Program.

7.    I am familiar with plaintiff's, Laborant LLC (Laborant), allegations in the above-captioned matter, and I have personal knowledge of the facts underlying these allegations. Indeed, as described below, I was directly involved in investigating Laborant's allegations relating to claims filed for reimbursement through the Uninsured Program.

8.    I submit this declaration in support of the Government's Motion for Summary Judgment, and in order to explain: (i) the Uninsured Program; (ii) the multi-step process for submitting claims for reimbursement; (iii) the circumstances surrounding the imposition of the March 22, 2022, claim submission deadline; (iv) discontinuation of the Provider Relief Bureau payments as a result of the rescission of UIP funds under the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023); and (v) Laborant's participation in the UIP, including its submissions of COVID-19 testing claims after March 22, 2022, through its clearinghouse, Change Healthcare.

II.    Overview of the Uninsured Program

    A.    Relevant Appropriations Statutes

9.    Congress passed the Families First Coronavirus Response Act ("FFCRA") on

March 18, 2020, which appropriated $1 billion to the Public Health and Social Services Emergency Fund to reimburse health care providers for COVID-19 testing claims of "uninsured individuals" who were not enrolled in a federal health care program or a "group health plan or health insurance coverage offered by a health insurance issuer … or a health plan offered under chapter 89 of title 5, United States Code." Pub. L. No. 116-127, 134 Stat. 182 (2020).

10.    Through the Paycheck Protection Program and Health Care Enhancement Act ("PPPHCEA"), Pub. L. No. 116-139, 134 Stat. 620 (2020), Congress further appropriated an additional $1 billion specific to testing for the uninsured. 134 Stat. at 626. By February 2021— before Laborant had submitted its first claim to the UIP—program funds for testing claims reimbursement under this dedicated $1 billion PPPHCEA appropriation and the $1 billion appropriation under the FFCRA were exhausted.

11.    On March 27, 2020, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), which appropriated $100 billion to the Public Health and Social Services Emergency Fund for health care providers "for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116–136, 134 Stat. 563 (2020). HHS created the Provider Relief Fund ("PRF") using these funds.

12.    Additional amounts for the PRF were appropriated through PPPHCEA (in addition to and separate from the $1 billion discussed above), and the American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 40.

13.    The Secretary of HHS allocated a portion of the PRF funding that came from the CARES Act, PPPHCEA, and ARPA to reimburse providers for COVID-19 testing for the uninsured and treatment of uninsured individuals with COVID-19 and to also reimburse providers for administering Food and Drug Administration ("FDA")-authorized or -licensed

COVID-19 vaccines to uninsured individuals under the Uninsured Program.

14.    On June 3, 2023, Congress passed the Fiscal Responsibility Act of 2023 ("FRA"). Pub. L. 118-5.  The FRA rescinded most unobligated funds appropriated under various COVID-19 emergency packages, including from the PRF, except for certain carve-outs.  The minimal amounts remaining after congressional rescission of unobligated COVID-19 emergency funds were specifically intended only for program administration and oversight activities.

15.    Because Congress had rescinded unobligated funding under the relevant statutory provisions appropriating funds to the PRF, HRSA posted notice on its website on June 5, 2023, that "no further payments will be made to providers under the Provider Relief Fund or the American Rescue Plan Rural Distribution, including no reconsideration payments.  Likewise, no additional claims payments will be made under the Uninsured Program or Coverage Assistance Fund."  https://www.hrsa.gov/provider-relief; https://perma.cc/DMF8-DSJ8 (same).

B.    UIP Overview

16.    Generally speaking, the Uninsured Program was a voluntary program that provided reimbursement for eligible claims on a rolling basis to eligible health care providers and facilities for testing, treatment, and vaccine administration of uninsured individuals during a prescribed time period.

17.    Specifically, health care entities who conducted COVID-19 testing of uninsured individuals or provided treatment to uninsured individuals with a COVID-19 primary diagnosis on or after February 4, 2020, or administered an FDA-authorized or -licensed COVID-19 vaccine to uninsured individuals on or after December 14, 2020, could submit claims for reimbursement to the program electronically, which were reimbursed generally at Medicare rates, subject to available funding.  As described below, providers were made aware that reimbursement was subject to available funding through statements on various program

webpages, FAQs, and as part of the patient roster submission process.

18.    The purpose of the program was to expand access to COVID-19 testing, treatment, and vaccination during the pandemic to the estimated 29 million uninsured individuals nationwide.  The UIP built on existing infrastructure (*e.g.*, using the Medicare billing system that providers commonly use and generally aligning with Medicare processes, pricing, and codes) to mitigate COVID-19 transmission and its impact by removing cost as a barrier to COVID-19 testing, treatment, and vaccination for eligible patients and supporting providers serving vulnerable populations during a public health crisis, within the limits of available funding.

19.    In 2020, HRSA contracted with UnitedHealth Group ("UnitedHealth") to help administer the Uninsured Program.  Effective July 20, 2021, HRSA's contract for administration of the UIP was transferred from UnitedHealth to OptumServe Technology Services, Inc. ("OptumServe"), which is a subsidiary of UnitedHealth.[1]  OptumServe's role was to utilize its technological expertise to quickly enable claims processing and reimbursement for COVID-19 testing and treatment (and vaccination administration fees, once vaccines were available), as directed by HRSA.  At no point was OptumServe ever authorized by HRSA to waive deadlines or modify claim submission process for non-compliant providers, nor could it commit or expend funding without explicit authorization by HRSA officials.

20.    To submit claims to the UIP, providers were required to use two systems: the UIP Portal and the Medicare Electronic Data Interchange ("MEDI").  The UIP Portal was used by providers to (1) enroll in the Uninsured Program, and (2) submit a "patient roster" and attest to the Terms and Conditions.  Once this process was complete (i.e., the providers were enrolled and

---

[1]  Since HRSA's contract with OptumServe was the contract that was in effect during the relevant time period that Laborant participated in the UIP, I will refer exclusively to OptumServe when discussing HRSA's contractor for claims reimbursement under the UIP.

the provider successfully submitted patient rosters), OptumServe generated temporary member identification numbers ("temporary member IDs" or "temporary IDs") as appropriate, which providers then used to submit claims for reimbursement utilizing the MEDI, a system widely used throughout the provider community.

21.    Participant providers were required to attest to certain Terms and Conditions with each patient roster submission, including that the provider acknowledged that full compliance with the Terms and Conditions was material to the Secretary's decision to disburse funds.  There were different versions of the UIP Terms and Conditions that were applicable during the time the UIP was in operation.  Because, as described below, providers had to attest to the Terms and Conditions *each time* with *each* patient roster submission, different claims could be subject to different Terms and Conditions.  *See* https://www.hrsa.gov/provider-relief/compliance/terms-conditions.

C.    Claim Submission

1.    Submission Steps

22.    In a nutshell, the claims process entailed five basic steps: (1) provider enrollment; (2) provider's submission of patient rosters; (3) OptumServe's generation of temporary member IDs; (4) provider's submission of claims; and (5) claims adjudication, approval, and reimbursement (as applicable), subject to available funding.

23.    *First*, the health care entity was required to enroll in the Uninsured Program as a participant, either individually in the case of a single provider or on behalf of multiple providers *(e.g.*, a physicians' group) via the UIP Portal in order to be able to submit claims and receive reimbursements for eligible services.  *See* Appendix to Government's Motion to Dismiss, A6-7 (UIP FAQs).  A provider was required to complete this first step only once, whereas the subsequent steps needed to be performed for each submission of patient rosters and claims.

6

24.     To enroll, the entity completed their Taxpayer Identification Number (TIN) Administrator enrollment and linked the bank account(s) that would receive reimbursements.  If the health care entity did not previously do business with OptumServe, they also had to submit a provider roster (*i.e.*, a list of individual health care providers who would actually provide the services/treatment).  This information was required to ensure compliance with the statutory requirement that the health care entity enrolling for payments shall have a valid TIN.

25.     *Second*, the provider submitted the required patient information (also referred to as a patient roster) in the UIP Portal.  Patient information was required so that OptumServe could identify patients that did not meet the definition of uninsured.  This information was required to provide an additional program integrity check (*e.g.*, in addition to the requirement imposed on providers in the UIP Terms and Conditions) to meet the statutory requirement that funds were not used to reimburse expenses that were reimbursed from other sources or that other sources were obligated to reimburse *(e.g.*, claims for patients that were enrolled in public or private insurance).

26.     When uploading patient information into the UIP Portal, the provider attested that they had read and agreed to the applicable at that time UIP Terms and Conditions, which were available via hyperlink on the attestation page, and that they were authorized to agree to the terms on behalf of the provider.  Providers also attested that they had checked for health coverage and confirmed the patient was eligible (*i.e.*, uninsured), and that they would accept the reimbursement as payment in full and not balance bill the patient.  Providers further attested that they acknowledged that the provider may be asked to submit to HRSA's review process to determine whether payments were made correctly and they would provide any information requested related to the disposition of funds received from the UIP, or for auditing, and reporting

purposes.  Finally, the provider attested to understanding that reimbursement was subject to available funding for the program.  *See* Appendix to Government's Motion to Dismiss, A98–99 (Sample batch upload attestation).

27.    *Third*, once the provider successfully uploaded a patient roster into the UIP Portal, OptumServe analyzed the patient information as submitted by the provider to verify eligibility, and only after it was verified, assigned a temporary member ID.  A unique temporary member ID was assigned to each verified patient included in the upload.  Appendix to Government's Motion to Dismiss, A52 (UIP webinar PowerPoint).  The temporary member ID was valid for a service period of 120 days.  That is, if a provider submitted a patient roster that included Patient A as having been tested on January 1, and OptumServe determined that Patient A did not have insurance on January 1 and issued a temporary member ID, that provider could submit claims on behalf of Patient A for services administered between January 1 and April 30 using that same temporary member ID.  But if that provider administered another test to Patient A after the expiration of the temporary member ID, for example on May 5, then in order to submit that claim, the provider would have to re-submit Patient A on a new patient roster with a May 5 date of service, OptumServe would re-validate that Patient A remained uninsured on May 5, and then re-issue a temporary member ID that could be used for claims submission for another 120 days from May 5.

28.    *Fourth*, only after temporary member IDs were generated and assigned to the patients could a provider submit the patient's associated claims electronically via the MEDI. The MEDI is the platform used by healthcare providers to submit claims for payment to payors, such as insurance companies and government programs like Medicare and Medicaid.

29.    *Finally*, as described in Subsections D below, once the provider submitted a claim

8

electronically via the MEDI, the claim went through the UIP validation, adjudication, and approval process.

### 2. The Role of Clearinghouses

30. Providers participating in the Uninsured Program used clearinghouses to submit claims on their behalf.  A clearinghouse (also sometimes called a medical intermediary) is an organization that enables the exchange of healthcare data between the provider and the payer (often an insurance company or a government agency).  It is the only HIPAA-covered entity that is used to translate between standard and non-standard transaction formats.  As such, clearinghouses/medical intermediaries provide solutions that enable data submission from provider systems into the HIPAA 837 claim format required for claims submission and payment as part of this program.  *See* https://www.hrsa.gov/about/faqs/what-clearinghouse

31. A clearinghouse would transmit to OptumServe whatever claims data the clearinghouse received from a provider.

32. The only way for the UIP to process and potentially reimburse a claim was for the claim to be received by OptumServe through the UIP EDI Gateway.  Thus, submission of claims by a provider to their Clearinghouse Partner did not constitute submission of claims to the UIP. The Clearinghouse Partner still had to submit the claims through MEDI to the UIP EDI Gateway.

33. As a standard practice of ingesting claims, claims received after 4 pm EST on a specific date were processed the following day. Such claims would have their submission date recorded as the following date.

34. As discussed in more detail later, testing and treatment claims had to be submitted to the UIP by 11:59 pm EST on March 22, 2022; claims for reimbursement for vaccine administration had to be submitted to the UIP by 11:59 pm EST on April 5, 2022.  Testing and

9

treatment claims submitted after the March 22 testing and treatment deadline but before the April 5 vaccine administration deadline were rejected by the Gateway's Advanced Communication Engine (ACE) Smart Edits, which was an automated claims rejection filter administered by OptumServe. OptumServe used ACE edit logic to apply program guidelines established by HRSA. In addition to being rejected for submission after the testing and treatment deadline, claims were rejected by ACE for a number of reasons, including but not limited to: automated patient eligibility checks, duplicative claims, service codes not covered under UIP, timeliness, and billing/provider data errors.

35.     In order to operationalize the March 22 deadline, beginning at 11:59 pm EST on March 22, OptumServe held all claims received at the Gateway until the ACE edit applying the testing and treatment deadline was deployed. Once deployed, the held claims were released, and all testing and treatment claims would be rejected for untimely submission (if not otherwise rejected as ineligible). All held vaccine administration claims would proceed through for processing.

36.     Note that all claims received on March 22, 2022 after 4 pm EST but *before* 11:59 pm EST were not subject to this hold. Due to the ingestion process described in paragraph 33 above, all these claims would have their submission date recorded as March 23, 2022. In other words, testing and treatment claims received on March 22, 2022 after 4 pm EST but before 11:59 pm EST were considered timely even though they appeared to have a submission date of March 23, 2022.

37.     Beginning on April 6, 2022, all claims submitted to the UIP EDI Gateway were rejected.

10

D.    Claim Processing

1.    Validation and Adjudication of Claims by OptumServe

38.    For claims that were timely submitted, HRSA's contractor, OptumServe, was required to have claims processing procedures in place.  After OptumServe received claims, the claims went through a pre-processing stage, validation, and *then* adjudication before HRSA's approval and reimbursement.

39.    As a practical matter, the pre-processing, validation, and adjudication steps occurred as a sequential evaluation process, meaning that if claims were rejected anywhere in the ordered sequence described below, they did not move to the next step:

i.    As explained above, the provider's Clearinghouse Partner submitted the provider's claims electronically through the MEDI to the UIP EDI Gateway.

ii.    At the UIP EDI Gateway, OptumServe performed initial claim format validations for accuracy of claim syntax and field population.  OptumServe assigned internal claim numbers to each claim and matched temporary member IDs submitted on the claim to temporary member IDs in the Consumer Database – a database that houses eligibility.

iii.    For claims that passed these pre-processing steps, OptumServe also ran the Gateway's ACE Smart Edits, the automated claims rejection filter that rejected claims due to reasons such as: submission after the deadline, patient ineligibility, duplicative claims, service codes not covered under UIP, timeliness, and billing/provider data errors.

iv.    Claims that failed any of these eligibility validations were rejected.  As OptumServe used a sequential evaluation process, claims would be rejected based on the first criteria that claim failed, even if it was ineligible for

11

multiple reasons.

v.     If the claim passed these threshold eligibility validations, OptumServe sent the claims into COSMOS for adjudication.  In COSMOS, claims were adjudicated against certain fields in the claim, such as:  valid diagnosis codes, procedures codes, and billed charges.

2.     Approval, Authorization, and Obligation of Claims

40.     Once claims were adjudicated and approved by OptumServe, the OptumServe-approved claims information was sent to HRSA to approve and obligate the funding necessary to reimburse those claims.  HRSA did not receive a funding request from OptumServe until OptumServe had completed all steps of pre-processing, validation, and adjudication.

41.     OptumServe sent the funding disbursement memorandum to the Administrative Officer of the PRB and the Contracting Officer Representative on the OptumServe contract.  The Administrative Officer sent the funding disbursement memorandum to the Associate Administrator of the PRB (or their designee) via email for review and approval.  When I became Acting Deputy Associate Administrator of PRB in March of 2022, I performed this review and approval of UIP payments.  This step was integral to the claims approval process and without this approval, the obligation of funds and reimbursement of claims would not occur.

42.     Once approved by the Associate Administrator or their designee, the Administrative Officer sent an approval email to the HRSA Office of Budget and Finance.

43.     Upon receipt of the approval email, the Office of Budget and Finance prepared a PSC-59 form to obligate the approved funds and to authorize the Program Support Center (PSC) to disperse funds to OptumServe.

44.     PSC Accounting Services initiated the obligation process when it received a

12

completed PSC-59 form.

45.     HRSA recorded obligations under the UIP only after: (1) OptumServe had successfully validated and adjudicated claims for reimbursement submitted to the UIP and recommended that those claims be approved for payment; and (2) HRSA, in fact, approved those UIP claims for payment.

III.     The March 22, 2022 Claims Submission Deadline and Subsequent End of the UIP

46.     Eligible providers began enrolling in the program on April 27, 2020 and submitting testing and treatment claims on May 6, 2020.  *See* Appendix to Government's Motion to Dismiss, A19 (UIP FAQs).  Providers began submitting vaccine administration claims on December 14, 2020.

47.     It is my understanding that by late 2021, the UIP monthly "burn rate" (*i.e.*, the amount of money being disbursed as reimbursements) was approximately $2 billion per month. By the time Congress was considering an omnibus spending bill in late February and early March 2022, the Agency had projected the limited pool of available funding would be depleted by mid-March 2022.

48.     On March 15, 2022, the White House announced the impending shutdown of the Uninsured Program due to a lack of sufficient funding.  *See* The White House, "FACT SHEET: Consequences of Lack of Funding for Efforts to Combat COVID-19 if Congress Does Not Act," https://perma.cc/5V5F-PH39 ("The fund that reimburses doctors and other medical providers for caring for uninsured individuals will start to be scaled back this month and end completely in early April.  Specifically, one week from today – March 22 – the Uninsured Program will stop accepting new claims for testing and treatment due to lack of sufficient funds.  Providers will no longer be able to submit claims for providing these services to uninsured individuals ….").

49.     The next day, HRSA announced (via OptumServe) the impending program

shutdown and provided the precise testing/treatment claim submission deadline of March 22, 2022 at 11:59 pm EST to the participant providers.  *See* Ex. C, (Mar. 16, 2022 deadline notice).  A reminder notice was emailed to participant providers in the final days of the claim submission period.  *See* Ex. D (Mar. 21, 2022 deadline notice).

50.    HRSA also posted a set of deadline FAQs on its website.  *See* Ex. E (Deadline FAQs).  The Deadline FAQs explained that testing and treatment claims submitted after March 22, 2022, would not be reimbursed.  *Id*. at 2–3.

51.    Ultimately, OptumServe processed and HRSA reimbursed all eligible claims submitted by eligible providers and received by OptumServe by the deadlines.

52.    Over the course of the UIP, more than 276 million claims were reimbursed totaling approximately $24.4 billion.

53.    On June 3, 2023, Congress enacted the FRA, which rescinded unobligated funds previously appropriated for various COVID-19 relief purposes, including the HRSA COVID-19 UIP.  Pub. L. 118-5, 137 Stat. 10 (June 3, 2023).

54.    After the enactment of the FRA, on June 5, 2023, HRSA posted a notice on its website explaining that no additional claims payments will be made under various COVID-19 relief programs, including the UIP.  https://www.hrsa.gov/provider-relief; https://perma.cc/DMF8-DSJ8.

IV.    Laborant's (dba ARCpoint Labs) Participation in the UIP

55.    Laborant enrolled in the UIP on November 30, 2020 and began submitting claims for reimbursement to the UIP on or around April 1, 2021.

56.    During the life of the program, Laborant submitted a total of 22,326 claims.  Of those, 8,618 were approved and paid, with Laborant receiving $624,665.22 in claims reimbursement from HRSA.  There is an outstanding overpayment to Laborant of $2,928.39.

14

57.     Through this lawsuit, Laborant seeks reimbursement for an additional 9,149 claims for COVID-19 testing that it alleges totaled approximately $2,384,515.  *See* First Amended Complaint, ECF 15.

58.     Laborant identified 9,152 claims to HRSA prior to filing suit.  At that time, Laborant provided a file with some, but not all, of the data HRSA needs to specifically identify these claims.  While Laborant included patient name, date of birth, and date of service, for example, HRSA additionally needs the claim numbers, temporary member ID numbers, and procedure codes for each claim in order to verify, with 100% accuracy, that it is analyzing the same claims for which Laborant argues it is entitled to reimbursement.  It is my understanding that, Laborant has confirmed that the claims it is pursuing in this case are the same claims that it identified in its pre-litigation demand, except for three; however on June 5, 2026, Laborant informed the United States that it was not able to locate the claim numbers for the claims at issue in this litigation and believes that it may not have them.

59.     Accordingly, I have used the information provided by Laborant (including patient name, date of birth, and date of service), as well as claims data HRSA has access to via its contractor, OptumServe, to try to identify the universe of 9,152 claims Laborant originally put at issue.  In doing so, where there was uncertainty regarding where, in the sequential evaluation process applied in the UIP Gateway, a claim at issue was rejected, I gave Laborant the benefit of the doubt by assuming that it advanced farther in the process.  Likewise, where a duplicate claim was submitted, my analysis is of the first claim received.

60.     Of these 9,152 testing claims:

     i.     7,395 were rejected as untimely because they were received by HRSA's UIP contractor OptumServe *after* the March 22, 2022 deadline.

ii.    1,279 were rejected by ACE because the temporary member ID associated with the claim was invalid.  Note that all 1,279 of these claims have a submission date after the March 22, 2022 deadline so may also be untimely, such that the total number of untimely claims would be 8,674.

iii.    177 were never received by OptumServe at all; and

iv.    301 were received by OptumServe prior to the March 22, 2022 deadline and were fully paid; Laborant was paid $20,186.63 for these claims.

61.    The letter that Laborant attached as exhibit 1 to its First Amended Complaint, ECF 15-1, does not contradict the above analysis.

62.    Although the November 1, 2023 letter Laborant cites appears generally on "Optum" letterhead, the "date of submission" indicated on that letter refers to when Laborant submitted its claims to Change Healthcare Electronic Data Interchange (EDI) Clearinghouse ("Change Healthcare"), the clearinghouse partner Laborant chose to assist with its COVID-19 Uninsured Program claims submissions, *not* the date of submission to *OptumServe*, the specific Optum subsidiary that was HRSA's UIP contractor.  *See* Section II.C.2, above.  This is indicated by the following:

i.    First, the letter references a "Change healthcare Service Request Number: 08629882," demonstrating the submissions in the form were from the perspective of Change Healthcare.

ii.    Second, the last page of the 290-page document is signed by Jameen Mathews, whose email was Jameen.Mathews@changehealthcare.com, demonstrating data pertained to what was in the possession of Change Healthcare, not OptumServe.

16

63.    Accordingly, the "Date of Submission" indicated on Exhibit 1 to Laborant's Amended Complaint reflects the date that ARCPoint Labs (what Laborant was doing business as) submitted its claims to the Change Healthcare Clearinghouse.  It does not reflect the date that the Clearinghouse submitted the claims electronically via MEDI or when they were received by the UIP EDI Gateway for processing, *i.e.* the date subject to the March 22, 2022 11:59 pm EST cut-off.

64.    I understand that Change Healthcare subsequently merged with another Optum subsidiary, but the only Optum subsidiary that had a contractual relationship with HRSA for purposes of UIP claim submission was OptumServe.  Moreover, the relationship between Laborant and Change Healthcare for clearinghouse services is a separate arrangement between those parties, that does not include the United States Government nor its contractor, OptumServe.

65.    In addition to examining the 9,152 claims Laborant identified, I have examined all of Laborant's claims submitted to the UIP in their entirety.  Laborant (via their clearinghouse) submitted a total of 22,326 claims to the UIP EDI Gateway prior to the complete closure of the UIP on April 5, 2022.  Of those:

    i.    10,954 claims were rejected as untimely because they were received after the March 22, 2022 deadline;

    ii.    2,721 claims were rejected by the Gateway's ACE Smart Edits because they had an invalid temporary member ID.  Of these, 2,454 claims have a submission date after the March 22, 2022 deadline so may also be untimely, such that the total number of untimely claims would be 13,408;

iii. 9 claims were rejected by the Gateway's ACE Smart Edits because they were duplicate claim submissions;

iv. 7 claims were rejected by the Gateway's ACE Smart Edits because they were medically unlikely or had coding errors;

v. 3 claims were rejected at the Gateway because the procedure codes with dates of service provided were not valid;

vi. 11 claims were denied because they had been cancelled, already processed, or were for procedure codes not otherwise covered by UIP;

vii. 3 claims were deleted, meaning the claims record was removed from the system, without completing adjudication process due invalid submission;

viii. 8,618 claims were paid; Laborant was paid a total of $624,665.22 for these claims.

66. All 22,236 claims submitted to the UIP have been accounted for. Accordingly, there are no valid, outstanding claims that have not been paid. In other words, every claim that Laborant submitted prior to the March 22, 2022 testing and treatment deadline has been processed in accordance with the UIP, and eligible claims have been adjudicated and paid.

Executed this 30th day of June 2026.

ALEXANDRA L. HUTTINGER -S
Digitally signed by ALEXANDRA L. HUTTINGER -S
Date: 2026.06.30 22:13:31 -04'00'

_____

Alexandra Huttinger